UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

MARSH & McLENNAN COMPANIES, INC. and
MARSH & McLENNAN AGENCY LLC,

                  Plaintiffs,

          -against-

EDWARD ORAVETZ, DAVID POTTS, ELISHA
JOHNSON, KEITH MCNEELY, and MARILU
BARAHONA-ALEJANDRE a/k/a MARILU
BARAHONA a/k/a MARILU ALEJANDRE,

                  Defendants.

------------------------------------------------------------------ x

Case No. 19-cv-07011

**COMPLAINT**

Plaintiffs, Marsh & McLennan Companies, Inc. ("MMC") and Marsh & McLennan Agency LLC ("MMA") (collectively, "Marsh Parties"), by their attorneys, Winston & Strawn LLP, as and for their Complaint allege as follows:

## NATURE OF THE ACTION

1.    The Marsh Parties bring this action against Edward Oravetz ("Oravetz"), David Potts ("Potts"), Elisha Johnson ("Johnson"), Keith McNeely ("McNeely"), and Marilu Barahona-Alejandre a/k/a Marilu Barahona a/k/a Marilu Alejandre ("Alejandre") (collectively, "Defendants")—its former employees—to address their unlawful misappropriation and misuse of the Marsh Parties' confidential information, and abrupt and coordinated departure and diversion of business for the benefit of one of the Marsh Parties' direct competitors, EPIC Insurance Brokers and Consultants ("EPIC"), in violation of confidentiality and non-solicitation agreements that each Defendant entered into with the Marsh Parties.

2.    Defendants are former employees of Visicor, Inc. ("Visicor"), an employee benefits insurance brokerage firm that was acquired by MMA on May 14, 2014.  Defendants

joined MMA after it acquired the business assets of Visicor. Oravetz was the majority shareholder of Visicor prior to its acquisition by MMA.

3.     While at MMA, Defendants Johnson, McNeely, Potts, and Alejandre (the "Oravetz Team") worked as a group under the supervision of Oravetz. Defendants were responsible for, among other things, servicing and developing client relationships for MMA, and developing and maintaining goodwill with its clients.

4.     MMA paid Defendants handsomely and provided them with the resources necessary to do their respective jobs and develop and nurture relationships with new, existing and potential clients, including, without limitation, office, marketing, administrative and product support, computer systems training, research, and travel and expense reimbursement.

5.     As trusted employees, Defendants were provided with access to the Marsh Parties' confidential, proprietary, and trade secret information only in connection with their employment by MMA. Such confidential information and trade secrets are of significant economic value to the Marsh Parties, and would also be of significant economic value to competitors, including EPIC.

6.     To safeguard their confidential, proprietary, and trade secret information from being used for any unauthorized purpose—*i.e.*, for any purpose other than in the performance of their job duties for the Marsh Parties' exclusive benefit— the Marsh Parties required, and the Defendants each agreed, to be bound by confidentiality covenants. Pursuant to these confidentiality covenants, the Defendants agreed to, among other items, keep confidential, the proprietary and trade secret information of the Marsh Parties. As a means reasonably calculated to protect the Marsh Parties' confidential information and goodwill, Defendants also agreed, among other things, to not solicit or service the Marsh Parties' current or prospective clients and

employees for a limited period of time. As demonstrated below, Defendants brazenly breached each and every one of these obligations. Further, Defendants Oravetz and Potts breached additional agreements containing confidentiality and non-solicitation covenants.

7.     Led by Defendant Oravetz who, upon information and belief, began recruitment efforts months prior, the Oravetz Team abruptly resigned from their employment with MMA on June 14, 2019, in a coordinated group exit. MMA was not aware the Defendants were considering leaving—let alone joining its competitor EPIC—until after they had apparently secured employment with EPIC and announced their intent to resign *en masse*.   Upon information and belief, Defendants did not return, and indeed took with them to EPIC, the Marsh Parties' confidential, proprietary, and trade secret information, including client documents.

8.     In the wake of Defendants' departures, the Marsh Parties have learned that Defendants have been using the Marsh Parties' confidential, proprietary, and trade secret information to compete with MMA for the benefit of EPIC. Upon information and belief, Defendants, while still employed at MMA, began to contact MMA's clients to solicit their business on behalf of EPIC and began surreptitiously planning to use the Marsh Parties' confidential, proprietary, and trade secret information to lure away clients.

9.     Since their departure, Defendants have been calling and e-mailing MMA clients, including clients never serviced by the Oravetz Team, to promote EPIC and solicit clients of MMA. Defendants have also utilized social media, including LinkedIn, to solicit MMA clients. As a result, Defendants now service at least five former MMA clients, including clients that had become clients of MMA as a result of the Visicor acquisition and that were developed and cultivated by Defendants as a result of MMA's investment.  Defendants have engaged, and are

continuing to engage, in a course of conduct designed to evade their contractual promises, violate their duties of loyalty, and steal existing and future business from MMA.

10.     At trial, the Marsh Parties will seek compensatory and punitive damages, and permanent injunctive relief enjoining Defendants' violative conduct.

## PARTIES

11.     Plaintiff MMC is a Delaware corporation with its principal place of business in New York, New York.

12.     Plaintiff MMA is a Delaware corporation with its principal place of business in White Plains, New York.  MMA's ultimate parent is MMC.  MMA provides risk management, insurance, and employee benefit support services to its clients.

13.     Upon information and belief, Defendant Edward Oravetz is a resident and citizen of the State of Texas. Prior to his resignation, he was a Senior Vice President and Employee Benefits Producer at MMA.

14.     Upon information and belief, Defendant David Potts is a resident and citizen of the State of Texas. Prior to his resignation, he was a Producer at MMA.

15.     Upon information and belief, Defendant Elisha Johnson is a resident and citizen of the State of Texas. Prior to her resignation, Johnson was a Senior Account Executive at MMA.

16.     Upon information and belief, Defendant Keith McNeely is a resident and citizen of the State of Texas. Prior to his resignation, he was a Vice President of Underwriting & Analytics and Employee Benefit Consultant at MMA.

17.     Upon information and belief, Defendant Marilu Barahona-Alejandre a/k/a Marilu Barahona, a/k/a Marilu Alejandre is a resident and citizen of the State of Texas. Prior to her resignation, Alejandre was an Account Manager at MMA.

## JURISDICTION & VENUE

18.    This Court has jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

19.    This Court may exercise personal jurisdiction over Defendants pursuant to CPLR Sections 301 and 302.

20.    This Court has personal jurisdiction over Defendant Oravetz pursuant to the Asset Purchase Agreement entered into by and among Visicor, the Stockholders of Visicor, MMA, and Oravetz, as Stockholder Representative, dated as of May 15, 2014 (the "APA"), which provides that "[a]ll actions and proceedings arising out of or relating to [the APA] shall be heard and determined exclusively in any New York state or federal court sitting in The City of New York."

21.    Venue is proper in this District because under the APA, Oravetz "irrevocably consent[ed] to and submit[ted] to" venue "in any New York state [sic] or federal court sitting in The City of New York."  Further, under the APA, "venue in any action initiated by [MMA] for specific performance or [Defendant]'s obligations and undertakings set forth in Section 9.1 (Confidentiality) and 9.2 (Restrictive Covenants) may, at [MMA's] option, be at any court having jurisdiction over such action."

22.    This Court has personal jurisdiction over Defendants Oravetz and Potts pursuant to a restrictive covenant agreement each entered into with MMC on May 22, 2017, in connection with an award of equity compensation in the form of restricted stock units in MMC (the "RCA"), which provides in pertinent part that, "[t]he parties… agree that any action or proceeding with respect to this Agreement and the Employee's employment shall be brought exclusively in the Civil Court of the City of New York, New York County, or in the Supreme

Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York and the parties agree to the jurisdiction thereof . . . ."

23.     Venue is further proper in this District because Defendants Oravetz and Potts agreed in the RCA to "irrevocably waive any objection they may now or hereafter have to the laying of venue of any such action in the said court(s), and further irrevocably waive any claim they may now or hereafter have that any such action brought in said court(s) has been brought in an inconvenient forum."

24.     This Court also has personal jurisdiction over each member of the Oravetz Team pursuant to non-solicitation and confidentiality agreements that each entered into with MMA effective as of the closing of the Visicor acquisition by MMA (the "Non-Solicitation and Confidentiality Agreement"), which provide that "[t]he parties being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matter contained herein, … agree that any action or proceeding with respect to this Agreement and Employee's employment shall be brought exclusively in the … United States District Court for the Southern District of New York," and the parties agreed to the jurisdiction thereof.

25.     Venue is similarly proper in this District because each member of the Oravetz Team agreed in his or her Non-Solicitation and Confidentiality Agreement that, "[t]he parties hereby irrevocably waive any objection they may now or hereafter have to the laying of venue of any such action in the said court(s), and further irrevocably waive any claim they may now or hereafter have that any such action brought in said court(s) has been brought in an inconvenient forum."

## FACTS

### A.   MMC's and MMA's Business

26.     MMC is a global professional services firm with businesses in insurance brokerage, risk management, reinsurance services, talent management, investment advisory, and management consulting.

27.     MMA, a subsidiary of MMC, is a national insurance brokerage firm that was established in 2008 to meet the insurance needs of mid-sized businesses.  MMA provides risk management, insurance, and employee benefit support services to its clients. These services include providing advice on insurance needs, negotiating terms and conditions of insurance policies on behalf of clients, and providing employee benefit support and advice. The insurance brokerage and other risk management business areas are highly competitive.

28.     From its inception, MMA has continued to build and develop its business by making substantial investments through the acquisitions of small and mid-sized insurance broking entities.

29.     MMA leverages the goodwill and best practices that have made each local partner agency successful, combining such practices with the resources and capabilities of the MMC family of companies.  Further, MMA looks to share best practices and information, such as client preferences and strategies, among MMA-acquired agencies, in furtherance of continued successful business development and the provision of insurance brokering services to its clients.

30.     Because its client relationships are at the core of its success, MMA expends a substantial amount of time, labor, and expense to not only develop and service actual and prospective clients, but to maintain a competitive advantage by obtaining important information from and building goodwill with them.

31.     MMA closely guards its client information and takes reasonable steps to ensure that all of its confidential and proprietary information remains secret, including by restricting access to this information.  To this end, MMA employees, such as the Oravetz Team, are required to abide by confidentiality, non-disclosure, and non-solicitation restrictions as a condition of their employment.  Further, when MMA bought Visicor, as discussed *infra*, it bound the sellers, including majority shareholder Oravetz, to contractual restrictive covenants including confidentiality obligations.

32.     MMC takes similar steps to safeguard its confidential and proprietary information and requires employees to abide by confidentiality, non-disclosure, and non-solicitation restrictions as a condition of their employment.

**B.      Visicor's Business and Relationship with Defendants**

33.     In or about February 2008, Visicor was formed by Oravetz to provide insurance brokerage services to businesses seeking employee benefits insurance and consulting services.

34.     On May 15, 2014, the APA was entered into by and among MMA, Visicor, the stockholders of Visicor, and Oravetz, as stockholder representative.  Defendant Oravetz was a signatory to the APA.  The purchase price for the acquisition of Visicor's assets was structured as a cash payout on closing, which occurred on May 15, 2014, and additional earn-out payments.

35.     The terms and conditions of the APA include payment by MMA to Visicor in connection with the closing of the deal and earn-out payment potential over a scheduled three-year period ending in May 2017.  In exchange for its assets, Visicor received more than several million dollars.  In exchange for his ownership interest in Visicor, Defendant Oravetz has received cash payments from the proceeds of the sale paid by MMA to Visicor.

36.     For MMA, a material aspect of the APA was the competitive value derived from Visicor's confidential and proprietary information, including, without limitation, client account information, insurance brokering strategies, and clients' insurance preferences, rates, and history, all of which Visicor developed at great expense and effort over many years and which MMA acquired as part of the APA. The purchase price paid by MMA for Visicor was determined, in part, in reliance on the material agreements and covenants of sellers, including Oravetz, not to undermine the ongoing business of MMA that it was purchasing in the APA.

37.     Upon MMA's purchase of Visicor, Defendants became employees of MMA.

**C.     Defendant Oravetz Enters into Various Agreements with MMA and MMC Requiring That He Would Not Solicit Clients or Misuse Confidential Information**

38.     To safeguard confidential and proprietary information and goodwill, the APA contains restrictive covenants, including confidentiality, non-competition, and non-solicitation/non-acceptance provisions.  Oravetz specifically acknowledged that he carefully read and considered those provisions of the APA and that he received sufficient economic consideration to justify the restrictive covenants.

39.     With respect to MMA's confidential information, Defendant Oravetz agreed in the APA to "keep all Proprietary Information of [MMA] and its Affiliates confidential and not to disclose or reveal any such Proprietary Information" to anyone other than his counsel, accountants, and financial advisors, and that he will not use such Proprietary Information for any purpose other than "(i) in connection with the evaluation and/or consummation of the [Visicor asset purchase]; (ii) to the extent necessary to obtain any of the consents required hereunder; or (iii) to enforce [his] rights and remedies under [the APA]."  Section 9.1 of the APA specified that "all Proprietary Information relating to the Acquired Assets," including the Restricted Accounts and the APA itself, is considered "Proprietary Information."

40.     Oravetz also agreed to a broad non-solicitation provision in the APA prohibiting him from trying to "solicit, accept, call on, divert, take away, influence, induce or attempt to do any of the foregoing with respect to the Active Prospective Clients of the Seller as of the Closing Date (wherever located) and the Client Accounts of the Seller that are part of the Acquired Assets or the Business."

41.     The APA's non-solicitation provision also included a provision prohibiting Oravetz from trying to "solicit, call on, divert, influence, induce or attempt to do any of the foregoing with respect to any of employees … of the Seller … to leave the employ or engagement of Purchaser or any of its Affiliates; (B) hire or attempt to hire any of the employees …. of the Seller on the Closing Date subsequently employed or engaged by Purchaser or any of its Affiliates or (C) attempt to influence or induce any such employee …to terminate or modify any Contract, arrangement or relationship with Purchaser or any of its Affiliates."

42.     Upon the sale of Visicor, Oravetz also entered into an employment agreement with MMA which contained confidentiality and non-solicitation covenants (the "Oravetz Employment Agreement").

43.     Pursuant to the Oravetz Employment Agreement, Oravetz agreed during a two-year period following the end of his employment that he would not disclose any confidential information of MMA and its subsidiaries.  He also agreed that he would not "directly or indirectly, solicit, sell, divert, provide services to, consult for, accept a broker of record letter with respect to, or accept any request to induce the termination, cancellation or nonrenewal" any existing client for which he had confidential information or had worked for. He further agreed

that he would not solicit prospective clients with which he had been in contact or assisted in soliciting during the twenty-four (24) preceding months.

44.     In addition, Oravetz agreed that he would not "directly or indirectly solicit the employment, consulting or other services of, or hire, any other employee or independent producer of the Company or any other MMA Company or otherwise induce any of such persons to leave the employment of the Company or any other MMA Company or to breach an employment or independent producer agreement with the Company."

**D.     Defendants Oravetz and Potts Agree to a Restricted Covenant Agreement with MMC**

45.     As a publicly traded company, MMC periodically grants shares of stock to recognize and retain select employees who work for its various subsidiaries and affiliates, including MMA.

46.     In connection with equity compensation awarded in the form of restricted stock units in MMC, Oravetz and Potts entered into the RCA on May 22, 2017.

47.     Under the RCA, Oravetz and Potts agreed that they would refrain from (i) using "for his or her own or another's purposes, or disclose to any other person or entity (other than in the proper course of employment with the Company[1]) any Confidential Information," (ii) directly or indirectly soliciting business from or performing services for the "Company's" clients for which they provided services on behalf of the "Company," and (iii) soliciting other "Company" employees.

48.     Oravetz and Potts also agreed in Section 2(b) of the RCA that, for a period of twelve (12) months after their departure from the Marsh Parties, they would not "directly or indirectly: (i) solicit clients of the Company for the purpose of selling or providing products or

---

[1] "Company" in the RCA is defined as MMC "and its affiliates and subsidiaries."

services of the type sold or provided by the Employee while employed by the "Company"; or (ii) induce clients or prospective clients of the Company to terminate, cancel, not renew, or not place business with the Company; or (iii) perform or supervise the performance of services or provision of products of the type sold or provided by [Oravetz or Potts] while he or she was employed by the Company on behalf of any clients or prospective clients of the Company; or (iv) assist others to do the acts specified in Paragraphs 2(b) (i)-(iii). This restriction shall apply only to those clients or prospective clients of the Company with which [Oravetz or Potts] had contact or about which [Oravetz or Potts] obtained Confidential Information or trade secrets during the last two (2) years of his or her employment with the Company."

**E.**  **The Oravetz Team Agrees to the Non-Solicitation and Confidentiality Agreement**

49.     Like Oravetz, each member of the Oravetz Team also agreed that he or she would not, for a period of two (2) years following separation from employment with MMA, directly or indirectly solicit business from or perform services for MMA clients for whom he or she provided services on behalf of MMA during employment.

50.     Each member of the Oravetz Team agreed that he or she would not (i) solicit MMA's clients for the purpose of selling services or products of the type sold or provided by employee while employed by MMA; or (ii) induce clients or prospective clients of MMA to terminate, cancel, or discontinue business with MMA; or (iii) perform or supervise the performance of services of the type sold or provided while he or she was employed by MMA on behalf of any clients or prospective clients of MMA.

51.     Each member of the Oravetz Team also agreed that he or she would not directly or indirectly, solicit, or endeavor to cause any employee of MMA with whom he or she came into contact for the purpose of soliciting or servicing business or about whom he or she obtained confidential information, to leave MMA.

52.     Each Defendant also agreed not to disseminate or disclose to any other person or entity any of MMA's or MMC's confidential client information.

**F.     Defendant Oravetz and the Oravetz Team Abruptly Terminate Their MMA Employment**

53.     On Friday, June 14, 2019, and without any prior notice, Defendant Oravetz and the rest of the Oravetz Team, in a coordinated fashion, resigned from their employment with MMA *en masse*.

54.     Immediately upon their resignation from the Marsh Parties, Defendant Oravetz and the Oravetz Team became employed by EPIC, a direct competitor of the Marsh Parties. Their arrival at EPIC was touted by EPIC in a June 20, 2019 press release.[2]

**G.     Defendants Breach Their Contractual Obligations to MMA and MMC**

55.     While Oravetz and the Oravetz Team were still employed by MMA, and continuing after they joined EPIC, Oravetz and the Oravetz Team engaged in a variety of coordinated and unlawful acts that harmed the Marsh Parties.

56.     Upon information and belief, Oravetz, while still employed by MMA, and in violation of his obligations not to solicit MMA employees under the APA, his MMA employment agreement and the RCA, solicited, induced, recruited, and/or made offers of employment to or assisted in the recruitment of or the making of offers of employment by EPIC to the other members of the Oravetz Team.

57.     Upon information and belief, Oravetz and the Oravetz Team choreographed their departures while still employed by the Marsh Parties, resigning on a Friday when MMA's office management was out of the office.

---

[2] EPIC ADDS NEW BENEFITS CONSULTING TEAM IN HOUSTON, June 20, 2019, *available at* https://www.EPICbrokers.com/press/EPIC-adds-new-benefits-consulting-team-in-houston/.

58.     Oravetz and the Oravetz Team were provided access to and gained knowledge of confidential information and trade secrets belonging to the Marsh Parties only as employees of MMA, including, without limitation: (a) information concerning MMA's operations and business strategies, including its commissions and fees; (b) information concerning MMA's clients, the identities of persons at such clients responsible for entering into contracts for MMA's services, such clients' risk characteristics, preferences, insurance coverages, insurance claims histories, needs and services, and the amounts paid by such clients to the Marsh Parties; (c) information concerning MMA's efforts to solicit and service clients; and (d) leads and referrals to prospective clients.

59.     Such confidential, proprietary, and trade secret information is of significant economic value to the Marsh Parties and is of significant economic value to the Marsh Parties' competitors, including EPIC.

60.     Upon information and belief, while they were still employed by MMA, Oravetz and the Oravetz Team inappropriately used the Marsh Parties' confidential, proprietary, and trade secret information to begin the process of soliciting MMA clients and prospective clients for the benefit of EPIC in violation of their confidentiality and non-solicitation covenants. Those business opportunities were developed for MMA, using MMA's resources and goodwill.

61.     For example, as reflected in Oravetz email communications, Oravetz, in the weeks leading up to his departure and while the APA's broad non-solicitation provision was in effect, endeavored to schedule contacts with MMA clients to "re-engage them," even though at that point he had no expectation of remaining at MMA.

62.     Similarly, upon information and belief, days before abruptly leaving MMA, David Potts sought to have a discussion with a contact about the renewals of two different clients of MMA, each of which has since taken its business to Epic.

63.     Upon information and belief, Oravetz and the Oravetz Team, have either directly or through others on behalf of EPIC, solicited existing clients of MMA which they had serviced as well as MMA's prospective clients.   Since their departure from MMA, Defendants have been calling and e-mailing MMA clients, including clients never serviced by the Oravetz Team, to promote EPIC and solicit clients of MMA. Defendants also have utilized social media, including LinkedIn, to solicit MMA clients. Included in the clients solicited for the benefit of EPIC are accounts that were specifically enumerated in the APA as being restricted from solicitation as well as clients that Oravetz and the Oravetz Team had cultivated at MMA's expense and serviced because of their work for MMA.

64.     To date, at least five former clients of MMA are, upon information and belief, now EPIC's clients as a result of the misconduct of Oravetz and the Oravetz Team.

65.     Upon information and belief, Defendants are continuing to attempt to persuade additional existing and prospective clients of MMA to break their ties with MMA.

66.     When Oravetz and the Oravetz Team resigned from MMA, they failed to return MMA's property, including documents and electronically stored information. Such property includes, upon information and belief, MMA's files concerning clients, pricing information, and other proprietary business information belonging to MMA.

67.     Upon information and belief, Oravetz and the Oravetz Team intend to continue soliciting MMA's existing and prospective clients and diverting them to EPIC in violation of their contractual obligations.

68.     As a result of Defendants' violative acts, MMA has been deprived of its client accounts and prospective relationships and associated goodwill that were not only purchased pursuant to the APA but also nurtured at the expense of MMA during the employment of Oravetz and the Oravetz Team.

## COUNT I

**Breach of the APA and Oravetz Employment Agreement  (Non-Solicitation)**
**(Defendant Oravetz)**

69.     MMA incorporates by reference and realleges Paragraphs 1 through 68 as if fully set forth herein.

70.     MMA and Oravetz were parties to the APA, which was a valid and binding agreement that provided for the sale of Visicor assets to MMA.

71.     The APA provided, among other things, that Oravetz would sell his interest in Visicor, including client accounts and the confidential and proprietary information and goodwill associated with such accounts.

72.     The APA further provided that, for a five-year period beginning May 15, 2014, Oravetz would not solicit, accept, call on, divert, take away, influence, induce, service, or attempt to do any of the foregoing with respect to a certain list of specified accounts ("Restricted Accounts"), the rights to which MMA had bought under the APA.

73.     MMA and Oravetz were also parties to the Oravetz Employment Agreement, which was a valid and binding agreement.

74.     Pursuant to the Oravetz Employment Agreement, Oravetz also agreed that he would not "directly or indirectly, solicit, sell, divert, provide services to, consult for, accept a broker of record letter with respect to, or accept any request to induce the termination, cancellation or nonrenewal" any existing client for which he had confidential information or had

worked for. He further agreed that he would not solicit prospective clients with which he had been in contact or assisted in soliciting during the twenty-four (24) preceding months.

75.     In addition, Oravetz agreed that he would not "directly or indirectly solicit the employment, consulting or other services of, or hire, any other employee or independent producer of the Company or any other MMA Company or otherwise induce any of such persons to leave the employment of the Company or any other MMA Company or to breach an employment or independent producer agreement with the Company."

76.     In consideration for this promise, and for the acquisition of his interest in Visicor, Oravetz has received substantial cash payments from the proceeds of the sale.  Oravetz would not have received any such proceeds if he did not sign the APA, and thereby accept its restrictions.

77.     MMA has fully performed all promises, covenants, and conditions under the APA and the Oravetz Employment Agreement.

78.     Upon information and belief, in the weeks before his abrupt and coordinated departure, Oravetz endeavored to schedule contacts with clients of MMA that were subject to the APA and the Oravetz Employment Agreement in order to "re-engage" them.

79.     Upon information and belief, using MMA's confidential and proprietary information, Oravetz solicited Restricted Accounts from MMA and diverted those accounts to EPIC, where he is servicing and intends to service the accounts, all in breach of the APA.

80.     Oravetz's breach of the APA and the Employment Agreement has caused MMA monetary damage, loss of goodwill, harm to its business reputation, and other injury and damages.

81.     MMA is entitled to recover damages resulting from Oravetz's breach of the APA and the Oravetz Employment Agreement (that are presently unascertainable, but are in excess of $75,000, plus interest) in an amount to be proven at trial.

### COUNT II

**Breach of the APA and Oravetz Employment Agreement (Confidentiality)**
**(Defendant Oravetz)**

82.     MMA incorporates by reference and realleges Paragraphs 1 through 81 as if fully set forth herein.

83.     MMA and Oravetz were parties to the APA, which was a valid and binding agreement that provided for the sale of Visicor assets to MMA.

84.     The APA provided, among other things, that Oravetz would sell his interest in Visicor and, for a specified period of time (the "Restricted Period"), would not use confidential and proprietary information associated with the Visicor assets bought by MMA thereunder.

85.     In consideration for this promise, and for the acquisition of his interest in Visicor, Oravetz has received substantial cash payments from the proceeds of the sale.  Oravetz would not have received any such proceeds if he did not sign the APA, and thereby accept its restrictions.

86.     MMA has fully performed all promises, covenants, and conditions under the APA.

87.     As set forth above, the APA further provides that, for the Restricted Period, Oravetz would not misuse MMA's confidential information.

88.     MMA and Oravetz were also parties to the Oravetz Employment Agreement, which was a valid and binding agreement.

89.     Pursuant to the Oravetz Employment Agreement, Oravetz also agreed during a two-year period following the end of his MMA employment that he would not disclose any confidential information of any MMA company.

90.     Upon information and belief, Oravetz has used and continues to use MMA's confidential and proprietary information in furtherance of his solicitation of MMA clients and prospective clients for the benefit of himself and EPIC, which has resulted in the diversion of accounts to EPIC, all in material breach of the APA and the Oravetz Employment Agreement.

91.     Upon information and belief, Oravetz materially breached the APA by misusing MMA's confidential and proprietary information, including, without limitation, Restricted Account information, insurance broking strategies specific to Restricted Accounts, and Restricted Accounts' insurance preferences, rates, and history, all of which Visicor developed at great expense and effort over many years and which MMA acquired as part of the APA and the Oravetz Employment Agreement.

92.     Oravetz's breach of the APA has caused MMA monetary damage, loss of goodwill, harm to its business reputation, and other injury and damages.

93.     MMA is entitled to recover damages resulting from Oravetz's breach of the APA and the Oravetz Employment Agreement (that are presently unascertainable, but are in excess of $75,000, plus interest) in an amount to be proven at trial.

<u>**COUNT III**</u>

**Breach of the Restrictive Covenant Agreement
(Defendants Oravetz and Potts)**

94.     MMC incorporates by reference and realleges Paragraphs 1 through 93 as if fully set forth herein.

95.     The RCA entered into between MMC on the one hand, and Defendants Oravetz and Potts, respectively, on the other, are valid, binding, and enforceable contracts.

96.     The RCA was entered into in connection with the granting of restricted stock units of MMC to Oravetz and Potts.  MMC periodically grants shares of stock to recognize and retain select employees who work for its various subsidiaries and affiliates, including MMA.

97.     As set forth above, the RCA requires that Oravetz and Potts maintain the confidentiality of MMC's ("MMC" is defined in the RCA as MMC "and its affiliates and subsidiaries") information and not (i) solicit MMC's clients for the purpose of selling or providing products or services of the type sold or provided by the Employee while employed by the Company; or (ii) induce MMC's clients or prospective clients to terminate, cancel, not renew, or not place business with MMC; or (iii) perform or supervise the performance of services or provision of products of the type sold or provided by the employee while he or she was employed by MMC on behalf of any clients or prospective clients of MMC.

98.     MMC possesses a legitimate and protectable interest in its confidential information and relations with its clients.

99.     Upon information and belief, Oravetz and Potts used MMC's confidential information and trade secrets for the purpose of soliciting MMC's current and prospective clients on behalf of EPIC.

100.    Upon information and belief, in the weeks before his abrupt and coordinated departure, Oravetz endeavored to schedule contacts with clients of MMA that were subject to the APA in order to "re-engage" them.

101.    Upon information and belief, two days before abruptly leaving MMA, David Potts sought to have a discussion with a contact about the renewals of two different clients of MMA, each of which has since taken its business to Epic.

102.    Upon information and belief, Oravetz and Potts have solicited business on behalf of EPIC from MMA's clients and prospective clients that they solicited or served while employed by MMA.

103.    Since their departure from MMA, Defendants have been calling and e-mailing MMA's clients, including clients never serviced by the Oravetz Team, to promote EPIC and solicit clients of MMA. Upon information and belief, Defendants also have utilized social media, including LinkedIn, to solicit MMA clients.

104.    By virtue of this solicitation of MMA's clients and use of the Marsh Parties' confidential and trade secret information, Oravetz and Potts have violated the non-solicitation, non-service, and confidentiality obligations set forth in the RCA.

105.    Upon information and belief, Defendants Oravetz and Potts have served former MMA clients and solicited prospective clients on behalf of EPIC.

106.    Further, to date, five clients have terminated their relationship with MMA and, upon information and belief, Defendants Oravez and Potts directly or indirectly service those clients on behalf of EPIC.

107.    The RCA further requires Oravetz and Potts to refrain from soliciting MMC employees. Upon information and belief, Defendants Oravetz and Potts solicited Johnson, McNeely, and Alejandre to leave with them to join EPIC in violation of the RCA no-poach provision.

108.    As a direct and proximate result of the foregoing actions of Oravetz and Potts, MMC has suffered and will continue to suffer damages (that are presently unascertainable, but are in excess of $75,000, plus interest), which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

109.    Unless enjoined by this Court, Oravetz and Potts will continue to violate the confidentiality, non-solicitation, and non-service covenants contained in the RCA.

110.    As a result of these foregoing actions, MMC has suffered and will continue to suffer irreparable harm.

111.    MMC has no adequate remedy at law to prevent Oravetz and Potts's ongoing and continuing breaches and, consequently, MMC has no adequate remedy to prevent future injuries. Accordingly, MMC is entitled to an injunction pursuant to the RCA enjoining Oravetz and Potts from further violating the terms of the non-solicitation and non-service obligations set forth in the RCA.

## COUNT IV

### Breach of the Non-Solicitation and Confidentiality Agreements
### (Defendants Johnson, McNeely, Alejandre, and Potts)

112.    MMA incorporates by reference and realleges Paragraphs 1 through 111 as if fully set forth herein.

113.    The Non-Solicitation and Confidentiality Agreements are valid, binding, and enforceable contracts entered into between MMA on the one hand, and Defendants Johnson, McNeely, Alejandre, and Potts, respectively, on the other hand.

114.    As set forth above, the Oravetz Team members agreed that they would not (i) solicit MMA's clients for the purpose of selling services or products, of the type sold or provided by employee while employed by MMA; or (ii) induce clients or prospective clients of

MMA to terminate, cancel, or discontinue business with MMA, or (iii) perform or supervise the performance of services of the type sold or provided while they were employed by MMA on behalf of any clients or prospective clients of MMA.

115.    The Oravetz Team members further agreed that they would not on their own account or on behalf of any person, company, corporation, or other entity, directly or indirectly, solicit, or endeavor to cause any employee of MMA with whom they came into contact for the purpose of soliciting or servicing business or about whom they obtained confidential information to leave MMA.

116.    Upon information and belief, the Oravetz Team has solicited business on behalf of EPIC from MMA's clients and prospective clients that they solicited or served for the purpose of selling services or products of the type sold or provided by them while employed by MMA.  Since their departure from MMA, Defendants have been calling and e-mailing MMA's clients, including clients never previously serviced by the Oravetz Team, to promote EPIC and solicit clients of MMA. Upon information and belief, Defendants also have utilized social media, including LinkedIn, to solicit MMA clients.

117.    Upon information and belief, Oravetz Team has induced clients or prospective clients of MMA to terminate, cancel, or discontinue business with MMA.

118.    Upon information and belief, the Oravetz Team have performed or supervised the performance of services of the type sold or provided while they were employed by MMA for the benefit of EPIC.

119.    Upon information and belief, the Oravetz Team has used MMA's confidential information and trade secrets for the purpose of soliciting MMA's existing and prospective clients on behalf of EPIC.

120.    By virtue of this solicitation of MMA's clients and use of confidential and trade secret information, Defendants Johnson, McNeely, Alejandre, and Potts have violated the non-solicitation, non-disclosure, and confidentiality obligations set forth in their respective Non-Solicitation and Confidentiality Agreements.

121.    MMA possesses a legitimate and protectable interest in their confidential information and goodwill with its clients.

122.    To date, five clients have terminated their relationship with MMA and upon information and belief, the Oravetz Team directly or indirectly services those clients on behalf of EPIC.

123.    As a direct and proximate result of the foregoing actions of the Oravetz Team, MMA has suffered and will continue to suffer damages (that are presently unascertainable, but are in excess of $75,000, plus interest), which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

124.    Unless enjoined by this Court, the Oravetz Team will continue to violate the non-solicitation, non-disclosure, and confidentiality obligations covenants contained in the Non-Solicitation and Confidentiality Agreements.

125.    As a result of these foregoing actions, MMA has suffered and will continue to suffer irreparable harm. MMA has no adequate remedy at law to prevent the Oravetz Team's ongoing and continuing breaches and, consequently, MMA has no adequate remedy to prevent future injuries. Accordingly, MMA is entitled to an injunction prohibiting the Oravetz Team from further violating the terms of the non-solicitation and non-service obligations set forth in the Non-Solicitation and Confidentiality Agreements.

<u>COUNT V</u>

**Breach of the Duty of Loyalty Against
(Defendants Oravetz and Potts)**

126.    MMA incorporates by reference and realleges Paragraphs 1 through 125 as if fully set forth herein.

127.    By virtue of their role as executive employees of MMA, Defendants Oravetz and Potts owed a fiduciary duty of undivided loyalty, utmost good faith, and complete honesty to MMA.

128.    Within the scope of Defendants Oravetz's and Potts's employment, MMA entrusted them to interact with current and prospective clients on its behalf.

129.    MMA also entrusted Defendants Oravetz and Potts with confidential and trade secret information for the sole purpose of enabling them to perform their job responsibilities.

130.    MMA further entrusted Defendants Oravetz and Potts to supervise its employees.

131.    Defendants Oravetz and Potts owed a duty not to exploit their access to MMA employees, clients, prospective clients, and confidential and trade secret information to advance their own or EPIC's agenda.

132.    Upon information and belief, while still employed at MMA, Defendants Oravetz and Potts provided EPIC with confidential information regarding MMA's employees, clients, and prospective clients.

133.    Upon information and belief, while still employed by MMA, Defendants Oravetz and Potts stopped working on business development opportunities on behalf of MMA in order to divert those opportunities to their future employer, EPIC.

134.    Upon information and belief, beginning no later than 2019 and continuing up until their resignation from MMA, during which period they were employed by and receiving

substantial compensation from MMA, Defendants Oravetz and Potts acted contrary to the interests of MMA, and breached their obligations of confidentiality, faithlessly and surreptitiously seeking to divert and usurp MMA's clients developed by MMA for their own purposes and to benefit an MMA competitor, EPIC.

135.    Upon information and belief, Defendants Oravetz and Potts, while employed by MMA, solicited Alejandre, Johnson, and McNeely to leave employment with MMA and/or to join them at EPIC.

136.    By virtue of the acts described above, including, without limitation, their solicitation of MMA's clients through the use of confidential information, Defendants Oravetz and Potts violated their duty of loyalty to MMA to advance their own agenda and acted against MMA's interests during the course of their employment.

137.    As a result of their faithlessness, Defendants Oravetz and Potts have forfeited their right to compensation from MMA during their period of disloyalty, and, accordingly, MMA is entitled to recoup all compensation paid to Defendants Oravetz and Potts during such period.

138.    Defendants Oravetz and Potts have acted with intentional, malicious, and/or wanton disregard of MMA's rights and their conduct was so outrageous to warrant the imposition of punitive damages.

139.    As a direct and proximate result of Defendants Oravetz's and Potts's conduct, MMA has suffered damages (that are presently unascertainable, but are in excess of $75,000, plus interest), which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

<u>COUNT VI</u>

**Tortious Interference with Existing and Prospective Business Relationships**
**(Against All Defendants)**

140.  MMA incorporates by reference and realleges Paragraphs 1 through 139 as if fully set forth herein.

141.  MMA possesses a legitimate and protectable interest in its contracts and relations with its clients.

142.  MMA had pre-existing business relationships with the clients that Oravetz and the Oravetz Team diverted to EPIC.

143.  As a result of their employment with MMA, Defendants Oravetz and the Oravetz Team were intimately familiar with, and had detailed knowledge concerning, the business relationships that existed between MMA and MMA's specific clients that they diverted (and intend to divert) to EPIC.

144.  Defendants Oravetz and the Oravetz Team intentionally, with malice, and without privilege or justification, interfered with MMA's business relationships with certain clients using unfair or improper means, and/or with the intent to interfere with such relationships.

145.  Since their departure from MMA, Defendants have been calling and e-mailing MMA's clients, including clients never serviced by the Oravetz Team, to promote EPIC and solicit clients of MMA. Upon information and belief, Defendants also have utilized social media, including LinkedIn, to solicit MMA clients.

146.  Defendants' conduct was undertaken with malice, or in knowing disregard of or indifference to, the rights and interests of MMA and their conduct was so outrageous as to warrant the imposition of punitive damages.

147.    As a direct and proximate result of Defendants' interference, MMA has, upon information and belief, lost five clients to EPIC and stands to potentially lose more as a result of the improper interference of Oravetz and the Oravetz Team.

148.    As a direct and proximate result of Defendants' interference, jointly and severally, MMA suffered and will continue to suffer irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.

149.    MMA will suffer this harm unless and until Defendants are restrained from their respective current and intended conduct.

150.    As a direct and proximate result of Defendants' interference, jointly and severally, MMA has suffered damages (that are presently unascertainable, but in excess of $75,000), which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

## COUNT VII

### Unjust Enrichment
### (Against All Defendants)

151.    The Marsh Parties incorporate by reference and reallege Paragraphs 1 through 150 as if fully set forth herein.

152.    Defendants have unfairly taken advantage of, to their own unfair advantage and profit, the Marsh Parties' efforts, resources, and expenses in developing and maintaining its confidential information, investments in its employees, and investments in its relationships with its clients.

153.    Defendants have benefited from wrongfully using the Marsh Parties' resources to usurp MMA's insurance brokerage business for EPIC.

154.    Under principles of equity and good conscience, Defendants should not be allowed to retain the benefit of their unlawful and wrongful activities.

155.    Defendants have injured and continue to injure the Marsh Parties.

156.    As a direct and proximate result of the foregoing, the Marsh Parties are entitled to compensatory damages, prejudgment interest, attorneys' fees, and costs that are presently unascertainable and will be proven at trial, but which are in excess of $75,000.

**WHEREFORE**, the Marsh Parties respectfully request that judgment be made and entered against Defendants and in favor of the Marsh Parties, as follows:

A.    Enjoining and restraining Defendants, and any person or entity acting in concert with them or under their supervision, through June 14, 2021, and as extended during any period that Defendants have breached their obligations to the Marsh Parties, from soliciting or servicing, or inducing not to place business with the Marsh Parties, any clients of the Marsh Parties with whom Defendants had contact, or any clients or prospective clients which were included among the assets purchased by MMA from Visicor pursuant to the APA, or about which Defendants obtained confidential information and trade secrets, or for which Defendants were responsible for making (or assisting or supervising the making of) sales to, or performing or providing (or assisting or supervising the performance or provision of) services or products on behalf of, the Marsh Parties, during the last two (2) years of their employment;

B.    Enjoining and restraining Defendants, and any person or entity acting in concert with them or under their supervision, through June 14, 2021, and as extended during any period that Defendants have breached their obligations to the Marsh Parties, from soliciting, or inducing to not place business with the Marsh Parties, any prospective clients of the Marsh Parties with whom Defendants had contact, or prospective clients which were included among the assets

purchased by MMA from Visicor pursuant to the APA, or from whom Defendants solicited business on behalf of MMA during the last two years of their employment;

C.     Enjoining and restraining Defendants, and any person or entity acting in concert with them or under their supervision, from possessing, using, disclosing, or disseminating the Marsh Parties' proprietary and/or trade secret information (as defined in the respective agreements), in any hard copy or electronic files in the possession, custody, or control of Defendants or any entity acting in concert with them or under their supervision;

D.     Enjoining Defendants, and any person or entity acting in concert with them or under their supervision, from any other actions in violation of Defendants' contractual obligations and/or fiduciary duties owed to the Marsh Parties;

E.     Awarding compensatory damages to the Marsh Parties in an amount to be determined at trial, but in excess of $75,000, plus interest;

F.     Awarding exemplary and punitive damages in an amount to be determined at trial; and

G.     Granting the Marsh Parties their costs and disbursements incurred in connection with this litigation, including attorneys' fees, together with such other and further relief as the Court may deem just and proper.

Dated: New York, New York
           July 26, 2019

                                   WINSTON & STRAWN LLP

                                   By: /s/ Stephen L. Sheinfeld
                                   Stephen L. Sheinfeld
                                   Seth E. Spitzer
                                   Michael A. Fernández
                                   200 Park Avenue

New York, New York 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
ssheinfeld@winston.com
sspitzer@winston.com
mafernandez@winston.com

*Attorneys for Plaintiffs Marsh &*
*McLennan Companies, Inc. and*
*Marsh & McLennan Agency LLC*